*Real Estate Board of New York, Inc. v. The City of New York*

In the

# United States Court of Appeals

For the Second Circuit

―――――――――――――――

August Term 2025
Argued: November 3, 2025
Decided: July 13, 2026

No. 25-1506

―――――――――――――――

REAL ESTATE BOARD OF NEW YORK, INC., NEW YORK STATE ASSOCIATION OF
REALTORS, INC., BOHEMIA REALTY GROUP, BOND NEW YORK REAL ESTATE CORP.,
LEVEL GROUP INC., REAL NEW YORK LLC, FOUR CORNERS REALTY, LLC, 21 WEST 74
CORP., 8 WEST 119TH STREET HDFC,

*Plaintiffs-Appellants,*

*v.*

THE CITY OF NEW YORK, A MUNICIPAL ENTITY, SAMUEL A. A. LEVINE, AS
COMMISSIONER OF NEW YORK CITY DEPARTMENT OF CONSUMER AND WORKER
PROTECTION,

*Defendants-Appellees.*[*]

―――――――――――――――

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Samuel A.A. Levine—
the current Commissioner of New York City Department of Consumer and
Worker Protection—is automatically substituted in the caption for his predecessor
in office as a defendant in this case. The Clerk of Court is respectfully directed to
amend the caption as set forth above.

Appeal from the United States District Court
for the Southern District of New York
No. 24-cv-9678, Ronnie Abrams, *Judge*.

---

Before:     PARKER, LIVINGSTON, and KAHN, *Circuit Judges*.

On November 13, 2024, the New York City Council passed the Fairness in Apartment Rental Expenses Act, or the "FARE Act." The Act prohibits brokers from imposing fees (known as a brokers' fee) on tenants with respect to properties for which the broker has either (1) published a listing with the landlord's permission or (2) agreed to work on behalf of the landlord. The Act also prohibits landlords from conditioning the rental of an apartment on a prospective tenant engaging an agent.

Plaintiffs-Appellants, a group of trade associations, real estate brokerage firms, landlords, and other related organizations, sought a preliminary injunction to enjoin the law from going into effect, on the grounds that the law violated the United States Constitution and the Constitution of the State of New York. Defendants-Appellees, including the City of New York, opposed the preliminary injunction and moved to dismiss. The district court held oral argument on May 2, 2025, and on June 10, granted Defendants' motion to dismiss in part and denied Plaintiffs' motion for a preliminary injunction. We agree with the lower court's decision and **AFFIRM** the judgment of the district court.

---

SEAN MAROTTA (J. Andrew MacKenzie, *on the brief*), Hogan Lovells US LLP, Washington, D.C.; Claude G. Szyfer, Darya D. Anichkova, *on the brief*, Hogan Lovells US LLP, New York, NY, *for Plaintiffs-Appellants*.

JAMISON DAVIES (Richard Dearing, Claude Platton, *on the brief*), Of Counsel, *for* Steven Banks, Corporation Counsel of the City of New York, New York, NY, *for Defendants-Appellees*.

BARRINGTON D. PARKER, *Circuit Judge*:

On November 13, 2024, the New York City Council passed the Fairness in Apartment Rental Expenses Act, or the "FARE Act." The Act prohibits brokers from imposing a fee (colloquially known as a brokers' fee) on tenants with respect to properties for which the broker has either (1) published a listing with the landlord's permission or (2) agreed to work on behalf of the landlord. The Act also prohibits landlords from conditioning the rental of an apartment on a prospective tenant engaging an agent.

Plaintiffs-Appellants, a group of trade associations, real estate brokerage firms, landlords, and other related organizations, contend that the Act is constitutionally deficient in two ways. First, they argue that the Act violates their federal and state free speech rights by burdening their ability to publish rental listings and charge tenants for their services after doing so. Second, they argue that the Act violates the Contracts Clause of the United States Constitution by rendering existing agreements between landlords and brokers unenforceable.

In the district court, Plaintiffs sought a preliminary injunction to stop the Act from going into effect. The City opposed Plaintiffs' motion and moved to dismiss their claims. The district court granted Defendants' motion to dismiss in

3

part and denied Plaintiffs' motion for a preliminary injunction. We agree with the district court, and we **AFFIRM** the judgment.

## BACKGROUND

New York City has the largest rental market in the country, and rental properties account for nearly 70% of the City's overall housing stock. Jt. App'x at 669. Both parties agree that New York City is suffering from a housing crisis – as the demand for residential rental units continues to meaningfully outpace supply throughout the City. As of 2024, the median asking rent on publicly listed rentals in New York City was $3,500 a month and in 2023 the vacancy rate had dropped to 1.4%. *Id.* As a result of this, over half of the City's residents are "rent burdened" meaning they spend more than 30% of their income on their rent. *Id.*

In New York City, real estate brokers often act as intermediaries between tenants and landlords, and prospective tenants often do not interact directly with landlords. Brokers typically assist prospective tenants with searching, applying for, and obtaining approval for residential rental units. *Id.* at 670-71. Brokers also assist landlords with staging, advertising, and processing applications to fill vacant units. *Id.* at 670.

4

When landlords decide to list an apartment for rent in New York, they may enter into exclusive listing agreements with brokers, under which they hire a broker or brokerage firm to market the apartment on an exclusive basis. Some exclusive listings are advertised as "no-fee" listings. For "no-fee" listings, landlords pay directly for a broker's services. In some instances, however, the landlord's arrangement with the broker requires that the broker seek compensation from potential tenants via "fee" or "tenant-pays" exclusive listings.

Alternatively, landlords may choose to rent their properties through "open listings" by which various brokers market a property on a nonexclusive basis. When a broker successfully rents out an "open listing" unit, the broker who arranged the tenancy typically seeks compensation from the tenant who rents out the property.

In either case, brokers' fees can be substantial and generally range between roughly 8–15% of the annual value of the lease. Jt. App'x at 671. In most of the United States, the landlord is responsible for paying brokers' fees when a broker lists their property and finds a tenant to live in the unit. Jt. App'x at 672. New

York and Boston are the only two major American cities where these fees are often paid by tenants – regardless of whether those tenants hired the broker.[1] *Id.*

However, the prevailing relationship between landlords, brokers, and tenants was dramatically altered when the New York City Council passed the FARE Act in November 2024, by a vote of 42 to 8. The FARE Act effectively prohibits landlords and their agents from imposing compulsory brokers' fees on tenants and prohibits conditioning the rental of any unit on whether a tenant has engaged an agent. Specifically, the FARE Act provides that "a landlord's agent shall not impose any fee on, or collect any fee from, a tenant related to the rental of residential real property." N.Y.C. Admin. Code § 20-699.21(a)(1).[2] The law also provides that "any agent who publishes a listing for a rental of residential real property with the permission or authorization of the landlord for such property shall not impose any fee on, or collect any fee from, a tenant related to the rental of such property." § 20-699.21(a)(2). According to the City, the latter provision

---

[1] It is not certain from the record exactly what percent of rental unit listings were "fee" or "tenant pays" exclusive listings before the passage of the FARE Act. However, based on witness testimony, we can ascertain that approximately 50-70% of rental units listed in New York City were "fee" or "tenant pays" exclusive listings.

[2] Unless otherwise noted, all further section citations are to the New York City Administrative Code.

was included in the FARE Act to prevent landlords offering "open listings" from charging prospective tenants brokers' fees after failing to disclose their agency relationship with the broker advertising the listing.

The FARE Act also makes it unlawful for any person, including a landlord, to condition the rental of an apartment on the tenant "engaging any agent." § 20-699.21(c). The law provides for civil penalties and a private cause of action, § 20-699.23–24, and creates a rebuttable presumption that any agent publishing a rental listing "does so with the permission or authorization of the landlord of such property," § 20-699.21(e). If a landlord's agent, or any agent posting a listing with the landlord's authorization, violates the no-fee provisions of the FARE Act, the landlord can be found vicariously liable. § 20-699.21(b). In short, the Act prohibits landlords and their agents from imposing brokers' fees on tenants renting units when the tenants do not directly commission a broker's services, regardless of how a landlord hires a broker.

The FARE Act was enacted after a nearly year-long process which included extensive public hearings, a city-led investigation into the rental market, and substantial revisions to the initial draft legislation. During this process, many of the bill's supporters testified that brokers' fees made moving prohibitively

7

expensive in New York City, and tenants received little in return for their fee payments. The bill's detractors argued that the law would simply shift the cost of brokers' fees into rental prices – worsening the City's already-existing housing affordability problems.

The Act's effective date was deferred until 180 days after it became law to provide affected businesses and individuals with time to prepare for the operational changes required by the FARE Act. During that time, Plaintiffs brought this action for declaratory and injunctive relief, alleging that the FARE Act violated the United States and New York Constitutions, or, in the alternative, was preempted by state law. Plaintiffs sought an injunction barring enforcement of the so-called "publication bar" (§ 20-699.21(a)(2));[3] the so-called "no-conditioning provision" (§ 20-699.21(c));[4] and the bar on a landlords' agents charging tenants fees (§ 20-699.21(a)(1)). The City opposed the preliminary injunction and moved

---

[3] The "publication bar" prohibits any agent who publishes a listing with the permission or authorization of the landlord from imposing a fee on prospective tenants. § 20-699.21(a)(2). To the extent this opinion references the term "publication bar," it is worth noting that § 20-699.21(a)(2) does not inherently "bar" brokers from publishing any listing. Rather, it prohibits agents who publish a listing from imposing a fee on any tenant subsequent to the publication of the listing.

[4] The "no conditioning provision" prohibits conditioning a rental agreement on whether a potential tenant hired a real estate broker or other agent. § 20-699.21(c).

to dismiss. The district court asked the City if it wanted to request an evidentiary hearing, but the City declined the court's invitation. Eventually, the United States District Court for the Southern District of New York (Abrams, *J.*) held oral argument on the parties' motions and granted the City's motion to dismiss in part and denied Plaintiffs' motion for a preliminary injunction.

Specifically, the district court dismissed Plaintiffs' First Amendment claims and denied Plaintiffs' motion for a preliminary injunction on those claims as moot. *Id.* The district court found that, although § 20-699.21(a)(2) regulated "speech" within the meaning of the First Amendment, Plaintiffs had failed to state a plausible First Amendment claim because the FARE Act's publication bar "satisfies the *Central Hudson* test as a matter of law." *Real Est. Bd. of N. Y., Inc. v. City of New York*, 786 F. Supp. 3d 788, 811 (S.D.N.Y. 2025).

As for Plaintiffs' Contracts Clause challenge, the district court denied the City's motion to dismiss. *Id.* at 815. It concluded that issues of fact remained as to whether the Act's impairment of Plaintiffs' existing contracts was a reasonable and appropriate means of advancing the City Council's interests, thus precluding dismissal of the Contracts Clause claim as a matter of law. *Id.* The district court also denied Plaintiffs' motion for a preliminary injunction with respect to their

9

Contracts Clause claim after finding Plaintiffs "failed to establish that they [were] likely to prove that the FARE Act's impairment of existing tenant-pays exclusive listing agreements [was] not a reasonable and appropriate means of improving housing mobility." *Id.* at 818. The district court also dismissed Plaintiffs' state preemption claim, finding the FARE Act's "regulation of broker compensation" did not "unduly intrude" into the system of state laws governing real-estate transactions and brokers.[5] *Id* at 819.

The FARE Act became law on December 13, 2024, and went into effect on June 11, 2025, just hours after the district court denied Plaintiffs' request for injunctive relief.

This appeal followed.

## DISCUSSION

### I.   Standards of Review

We review the district court's denial of Plaintiffs' motion for a preliminary injunction for abuse of discretion and the legal conclusions underlying that decision *de novo*. *Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 106 (2d Cir. 2025) (citation omitted). "A district court has abused its discretion if it has

[5] Plaintiffs do not contend on appeal that the district court erred in dismissing the state preemption claim.

10

(1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions." *Warren v. Pataki*, 823 F.3d 125, 137 (2d Cir. 2016) (citation modified). Additionally, we review questions of law decided in connection with requests for preliminary injunctions *de novo*. *Lusk v. Village of Cold Spring*, 475 F.3d 480, 484 (2d Cir. 2007) (citation omitted).

The district court denied Plaintiffs' motion for a preliminary injunction as to § 20-699.21(a)(2) because it found, as a matter of law, that Plaintiffs failed to state a claim upon which relief can be granted. Therefore, our review begins by determining whether Plaintiffs' claims are legally viable. *See Hudson Shore*, 139 F.4th at 107. In determining if a claim is legally viable, "we accept all factual allegations as true, draw all reasonable inferences in favor of the plaintiffs, and we will not dismiss as long as the pleadings support more than a sheer possibility that a defendant has acted unlawfully." *Melendez v. City of New York*, 16 F.4th 992, 1010 (2d Cir. 2021) (citation modified).

## II. The First Amendment Challenge

The district court found that the FARE Act regulates commercial speech, which the Supreme Court has defined as "expression related solely to the

11

economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N. Y.*, 447 U.S. 557, 561 (1980) (citations omitted). "The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation." *Id.* But our caselaw differentiates commercial speech from other forms of expressive activity such as political speech. Commercial speech is carved out from our general First Amendment analysis and instead "enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 49 (2d Cir. 2019) (citation modified). In the commercial speech context, this Court typically applies the intermediate scrutiny test laid out by the Supreme Court in *Central Hudson*, 447 U.S. at 557.

Plaintiffs argue that even though the FARE Act only regulates commercial speech, it nonetheless violates the First Amendment because it prohibits brokers from publishing a listing and subsequently receiving compensation from the tenant who rents the listed unit, thus placing an unconstitutional burden on their

12

speech.[6]    First, Plaintiffs argue that § 20-699.21(a)(2) should be subject to heightened scrutiny because it burdens disfavored speech (rental listings) by disfavored speakers (real estate brokers).  In the alternative, Plaintiffs argue that § 20-699.21(a)(2) fails even intermediate scrutiny under *Central Hudson*.  The City, for its part, asserts that § 20-699.21(a)(2) does not implicate the First Amendment at all because the challenged regulation does not burden protected speech.  The City also argues that § 20-699.21(a)(2) survives First Amendment scrutiny regardless because intermediate, not heightened, scrutiny applies and the FARE Act survives this inquiry.

In dismissing Plaintiffs' First Amendment claim, the district court found that the FARE Act regulated speech within the meaning of the First Amendment but was content neutral and applied *Central Hudson*'s intermediate scrutiny test. *Real Est. Bd.*, 786 F. Supp. 3d at 804–05, 807.  The district court then found that § 20-699.21(a)(2) satisfied *Central Hudson* as a matter of law and dismissed Plaintiffs' First Amendment claims.  *Id.* at 811.  We agree with the district court's analysis.

---

[6] Plaintiffs also assert that the publication bar violates the New York Constitution's Free Speech Clause but concede that "[t]he New York Constitution affords commercial speech protection identical to the First Amendment."  Appellants' Br. 24 n.1.  We therefore consider both free-speech claims together under the applicable First Amendment standard.

The FARE Act regulates commercial speech, is subject to intermediate scrutiny, and is valid under *Central Hudson*.

**A.**

The City argues that Plaintiffs' First Amendment claim fails at its threshold because § 20-699.21(a)(2) regulates conduct and thus does not implicate the First Amendment. Specifically, the City argues that the regulation, "[b]y its plain terms . . . prohibits *no* speech whatsoever." Appellees' Br. at 29. However, a law need not *prohibit* speech to trigger judicial scrutiny. Laws that merely *burden* speech may also be subject to review under the First Amendment. "It is of no moment that [a] statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000). Under the First Amendment, "[l]awmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).

The FARE Act, through § 20-699.21(a)(2), plainly burdens Plaintiffs' commercial speech. Indeed, one of the key value-adding components of a broker's services is their ability to advertise listings with the eventual goal of consummating a rental transaction between a landlord and a renter. The Act's

14

"publication bar" prohibits a broker from charging a fee to a tenant only when a predicate act of speech (e.g., publishing a listing for rent) occurs. Accordingly, a broker's speech is the singular predicate act for application of § 20-699.21(a)(2). The FARE Act cannot escape First Amendment scrutiny simply because it makes certain kinds of speech commercially or economically unviable rather than outright prohibiting that speech. The Supreme Court has recognized that a regulation's "prohibition on compensation [for delivering speeches or writing articles] unquestionably imposes a significant burden on expressive activity." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995).

The City argues that *National Treasury* doesn't apply because the regulation challenged in that case directly burdened employees' expression and "the law explicitly targeted their expression by means of . . . ensuring they could not be paid for it," and the City asserts that the "FARE Act presents no comparable restrictions on brokers' expression." Appellees' Br. at 34. Yet that is exactly what § 20-699.21(a)(2) does. When brokers publish a listing, they are no longer permitted to be paid by a tenant for renting that unit. Both the regulation challenged in *National Treasury* and § 20-699.21(a)(2) "place[] a significant burden" on targeted speakers through a "denial of compensation," 513 U.S. at 462 (1995),

15

albeit, under § 20-699.21(a)(2), the limitation on compensation is partial. It is of no moment that *National Treasury* dealt with compensation for "making speeches, publishing scholarly articles, or even writing novels." Appellees' Br. at 33. First Amendment protections apply "[e]ven [to] dry information, devoid of advocacy, political relevance, or artistic expression." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001).

The City also argues that the FARE Act does not directly regulate brokers' protected expressive activity because the Act's prohibition on "charging a fee to a tenant whenever the landlord engages a broker's services or authorizes a broker to post a listing," simply "functions as one way of establishing that a broker is providing services to the landlord, such that the prohibition isn't contingent on speech at all." Appellees' Br. at 30 (internal citation omitted). But this is a rather hollow distinction. The FARE Act states that, "any agent who *publishes a listing* for a rental of residential real property with the permission or authorization of the landlord for such property shall not impose any fee on" a tenant related to the rental of real property. § 20-699.21(a)(2) (emphasis added). The plain language of the FARE Act thus makes clear that a brokers' commercial speech (publishing a property listing) is the key predicate act that bans a form of compensation. On its

16

face, the FARE Act's prohibition on tenant-pays brokers' fees applies to the expressive act of publishing a rental listing, not simply retention or an authorization by a landlord. Commercial speech is thus the antecedent act that is required to trigger the FARE Act's restrictions on broker compensation.

As a result, brokers are left with an "unwelcome choice" of "either restrict[ing] their [speech,]" or changing their business model in a way that "may be extremely expensive or even . . . impracticable." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217 (1975). This is a paradigmatic example of a limitation on speech that triggers constitutional scrutiny. Accordingly, we agree with the district court that § 20-699.21(a)(2) implicates the First Amendment.

**B.**

We next determine the appropriate level of scrutiny to apply. As discussed, *supra* Part II.A, because the FARE Act regulates only commercial speech, it enjoys less protection than other forms of expressive activity under *Central Hudson*. Because commercial speech enjoys only "limited" protection, laws and regulations

that restrict commercial speech are typically subjected to intermediate scrutiny. *Vugo*, 931 F.3d at 49.

In *Sorrell*, however, the Supreme Court recognized an exception to the general application of intermediate scrutiny in the commercial speech context. The Court wrote that "heightened judicial scrutiny is warranted" when a statute "is designed to impose a specific, content-based burden on protected expression." 564 U.S. at 565. In other words, *Sorrell* held that the application of intermediate scrutiny was insufficient when a challenged law "burdens disfavored speech by disfavored speakers." *Id.* at 564. Plaintiffs argue that this more stringent standard applies here because the FARE Act similarly "targets disfavored speech – rental listings – by disfavored speakers – brokers." Appellants' Br. at 24. We remain unconvinced that *Sorrell's* heightened standard applies here.

*Sorrell* held that heighted scrutiny is required "whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'" 564 U.S. at 566 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). There is nothing in the record or in the challenged legislative text that supports a finding that the City was concerned with the messages conveyed by any real estate listings posted by brokers or that § 20-699.21(a)(2) regulates speech

18

based on its content. The challenged regulation is agnostic as to the content of any listing, and instead simply restricts how a broker may be compensated after listing a unit. The FARE Act makes no attempt to control the contents of listings or target specific messages "for disfavored treatment." *Sorrell*, 546 U.S. at 565. In contrast, the legislation in *Sorrell* "[was] designed to impose a specific, content-based burden on protected expression." *Id*. The FARE Act does not impose its restrictions "by reason of content" which is "confirmed by the fact that petitioners 'cannot avoid or mitigate' the effects of the Act by altering their speech." *TikTok Inc. v. Garland*, 604 U.S. 56, 71 (2025) (citation omitted). Regardless of the message a broker includes in a publicly posted listing, he or she may not charge the tenant a fee once the unit is rented. Accordingly, the Act is content neutral.

The Supreme Court's decision four years after *Sorrell* in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), supports our conclusion that *Sorrell*'s heightened level of scrutiny should not be applied to § 20-699.21(a)(2). In *Reed*, the Supreme Court relied on *Sorrell* for the proposition that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," *Reed*, 576 U.S. at 163, and instructed courts to apply a higher level of scrutiny when "a regulation of speech 'on its face' draws

distinctions based on the message a speaker conveys," *id.* (quoting *Sorrell*, 564 U.S. at 564). Because the FARE Act makes no such distinctions, *Sorrell's* heightened scrutiny does not apply.

Even if a law is not facially content-based, we are also called on to examine "governmental motive, including whether the government had regulated speech because of disagreement with its message, and whether the regulation [is] justified without reference to the content of the speech." *Id.* at 167 (citation modified). There is no evidence that the FARE Act was driven by improper motives. Nothing in the legislative record indicates the City Council was concerned with the content of rental listings in passing the FARE Act or that the City Council was attempting to suppress the effectiveness or reach of any particular message, as opposed to simply trying to prevent landlords from disclaiming a relationship with brokers after authorizing those brokers to post apartment listings. *See, e.g.,* Jt. App'x at 676–78. In contrast, the "[f]ormal legislative findings accompanying [the challenged statute] confirm that the law's express purpose and practical effect are

to diminish the effectiveness of marketing by manufacturers of brand-name drugs." *Sorrell*, 564 U.S. at 565.

In arguing the FARE Act regulates speech based on content, Plaintiffs also point to *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85 (1977), in which the Supreme Court struck down a ban on "For Sale" yard signs. There, a New Jersey city banned the use of "For Sale" signs to "stem what it perceive[d] as the flight of white homeowners from a racially integrated community." *Id.* at 86. The city regulated "For Sale" signs specifically to "prevent its residents from obtaining certain information." *Id.* at 96. The Court expressed concern that the city "proscribed particular types of signs based on their content because it fears their 'primary' effect that they will cause those receiving the information to act upon it." *Id.* at 94. In other words, the city enacted the regulation "because of the topic discussed or the idea or message expressed" by the signs. *TikTok*, 604 U.S. at 71 (quoting *Reed*, 576 U.S. at 163).

*Linmark*, like *Sorrell*, does not apply here because the challenged regulation in *Linmark* was also designed to suppress disfavored messages. There was no corollary attempt by the City Council to suppress a disfavored message via the FARE Act because the Act makes no effort to curtail brokers' ability to include any

21

specific content in listings posted online. Nor does the law represent an attempt by the City Council to prevent New York City residents from obtaining or acting upon certain information. Accordingly, the FARE Act is content neutral.

We next turn to Plaintiffs' argument that the law should be subjected to heighted scrutiny because it singles out disfavored speakers – brokers. This argument is also unconvincing. While the Supreme Court has instructed that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," it does not follow that the FARE Act is presumptively invalid because it only applies to brokers. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). The Supreme Court has recognized that if a challenged regulation does not aim to "exercis[e] a content preference, speaker distinctions . . . are not presumed invalid under the First Amendment." *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 512 U.S. 622, 645 (1994). The City Council's decision to single out brokers in passing the FARE Act is perfectly sensible as brokers are the only people permitted to offer apartments in New York City and charge a broker fee. Thus, brokers are not *disfavored* by the law, but rather they are the only relevant ones to whom the law could apply, which, in turn, justifies the effect on the brokers' speech. Heightened scrutiny may be required when a legislature uses

22

speaker preference to control content or message expressed but, "such scrutiny is unwarranted when the differential treatment is justified by some special characteristic of the particular speaker being regulated," as is plainly the case here. *TikTok*, 604 U.S. at 73–74 (citation modified); *see also Turner Broad. Sys., Inc.*, 512 U.S. at 660–61 ("[S]uch heightened scrutiny is unwarranted when the differential treatment is 'justified by some special characteristic of' the particular medium being regulated." (citation omitted)). The FARE Act is therefore not impermissibly speaker-based and, consequently, does not trigger heightened scrutiny.

Plaintiffs' remaining arguments about the prohibition banning lawful transactions and thus impeding debate over central issues of public policy are also unavailing. In making this argument, Plaintiffs attempt to cast the FARE Act as a full advertising ban, similar to the law challenged in *44 Liquormart, Inc. v. Rhode Island*, in which the Supreme Court struck down the state's complete ban on price advertising for alcoholic beverages. 517 U.S. 484 (1996). But as the City correctly asserts, the FARE Act does not bar anyone from giving truthful information. Brokers simply cannot advertise a listing on behalf of a landlord and require a tenant to pay a fee to rent the same apartment. The FARE Act, unlike the law challenged in *44 Liquormart*, does not prohibit any "advertisements that provide

23

the public with accurate information." 517 U.S. at 489. Plaintiffs are free to continue advertising any apartment they would have listed before the enactment of the FARE Act, all that has changed is that Plaintiffs can no longer advertise an apartment on behalf of a landlord and then charge a tenant a fee to rent that apartment. Because the FARE Act restricts only commercial speech and is neither impermissibly content-based nor speaker-based, the intermediate scrutiny test set forth in *Central Hudson* applies.

## C.

*Central Hudson* lays out a four-prong test to determine if a challenged law or regulation can survive intermediate scrutiny. Under that test, courts ask whether: "(1) the speech restriction concerns lawful activity; (2) the City's asserted interest is substantial; (3) the prohibition 'directly advances' that interest; and (4) the prohibition is no more extensive than necessary to serve that interest." *Vugo*, 931 F.3d at 51 (quoting *Central Hudson*, 447 U.S. at 566). The district court held that the City satisfied each prong and concluded that, as a matter of law, Plaintiffs failed to plausibly allege a First Amendment or Free Speech Clause claim. The Court then granted Defendants' motion to dismiss these claims. *Real Est. Bd.*, 786 F. Supp. 3d at 811. Again, we agree with the district court's conclusion.

24

In challenging the district court's *Central Hudson* analysis, Plaintiffs argue that the three main interests articulated by the City cannot satisfy intermediate scrutiny. The putative interests articulated by the City in passing the FARE Act are principally: (1) aligning the principal-agent relationship, (2) increasing housing mobility, and (3) promoting the negotiability, fairness, and transparency of broker fees. Plaintiffs admit that "[s]ome of these interests check some of *Central Hudson*'s boxes" but argue that "none checks them all." Appellants' Br. at 31. Plaintiffs then proceed to analyze why each of the Council's interests, when standing alone, is insufficient to meet the standard required by *Central Hudson*. *Id.* at 31-43. However, Plaintiffs' analysis is flawed because nothing in our First Amendment caselaw requires us to disaggregate the Council's purported goals in enacting the legislation and examine each independently, rather than analyzing them together. While it is true that the City cannot rely on *post hoc* rationales for the FARE Act, *Cornelio v. Connecticut*, 32 F.4th 160, 173 n.5 (2d Cir. 2022), the City is not required to rest its argument on a single rationale. Instead, when conducting our *de novo* review of the lower court's opinion, we consider the interrelated justifications proffered by the City to determine whether these interests allow § 20-699.21(a)(2) to survive intermediate scrutiny under *Central Hudson*.

25

The parties do not dispute that *Central Hudson's* first prong, that the speech restriction concerns lawful activity, is satisfied, so our analysis is limited to prongs two through four of the *Central Hudson* test. We conclude that the City has identified a substantial interest in remediating what it views as market failures caused by brokers' fees and fashioned, through the FARE Act, a reasonable mechanism to redress those perceived harms.

**i.**

"Under the second prong of *Central Hudson*, the [City] must identify 'a substantial interest in support of its regulations.'" *Alexander v. Cahill*, 598 F.3d 79, 90 (2d Cir. 2010) (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995)) (citation modified). At this step, we must determine whether the City's asserted goals in passing the FARE Act are "substantial." *See Vugo*, 931 F.3d at 51. This prong is met. The City's putative interests are substantial. According to the City, its core regulatory goal in passing the legislation was to "correct a market failure and reduce punishing upfront costs for tenants seeking apartments." Appellees' Br. at 21. The City also intended the law to "accord with the commonsense principle that the party who retains a service provider should be the one who pays them." *Id.* at 47.

26

Economic and development-oriented objectives such as promoting the "economic vitality of [a] locality" are substantial interests that constitute acceptable reasons to regulate commercial speech. *DoorDash, Inc. v. City of New York*, 789 F. Supp. 3d 337, 356 (S.D.N.Y 2025) (quoting *Edwards v. District of Columbia*, 755 F.3d 996, 1002 (D.C. Cir. 2014)) (citation modified). The economic vitality of a city or locality rests in no small part on the health of its housing market. The City has attested to the harm that brokers' fees cause in New York City's rental market, explaining that they "increase the 'upfront costs[s]' tenants incur when renting an apartment, which 'impede mobility, contribute to lower housing vacancy rates, and potentially trap households in apartments that no longer meet their needs.'" *Real Est. Bd.*, 786 F. Supp. 3d at 808 (citation omitted).

Addressing these market failures advances a substantial interest, but intermediate scrutiny also requires that the City demonstrate the harms it recites are "genuine and not merely post-hoc rationalizations." *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 265 (2d Cir. 2014). Plaintiffs posit that the City Council's purported goal of "housing mobility" is such a post-hoc rationalization. Appellants' Br. at 38. In support of this argument, Plaintiffs rely on language from a Committee Report issued by the City Council's Committee on Consumer and Worker

27

Protection in advance of a vote on the FARE Act that concedes the Act "is not an attempt to solve the affordability crisis in the city," but is meant "to properly align the principal-agent relationship in the rental market to ensure that the principal pays the agent for services rendered, not a third party."  Jt. App'x at 676.

But the record, when taken as a whole, does not support Plaintiffs' argument that housing mobility is a post-hoc rationalization.  Indeed, that claim distorts the City Council's statements and conflates the issue of housing *mobility* with the issue of housing *affordability*.  While affordability and mobility are related, they are not the same issue.  Affordability is a broader issue related to the high cost of housing in New York City and the shortage of units available on New York City's rental market relative to the demand for those units.  The City Council's mobility concerns, on the other hand, were driven specifically by the high *upfront cost of moving* rather than the overall high cost of rent in New York City.  The Council's statement that the FARE Act would not be a solution to the affordable housing crisis reflects that the FARE Act was not viewed by the City Council as a panacea to solve the City's housing shortage.  The Council noted in the same report that solutions to the affordability problem were "being explored by the Council in multiple other avenues," as it prepared to vote on the FARE Act.  *Id.*

28

The distinction between housing affordability and mobility is borne out in the record. The same City Council Report cited by Plaintiffs for the proposition that the FARE Act was not intended to solve the City's affordable housing crisis begins its section titled "Issues and Concerns Related to Broker Fees" by stating that "[b]roker fees can be a significant financial burden for New York City renters who wish to move." *Id.* at 673. The Council's Report frames housing mobility issues caused by brokers' fees as a market failure under the current housing model. *Id.* ("60 percent of New York City renters said broker fees prevent them from moving into a different apartment . . . ."). The Report also bemoans the low turnover rates of New York City's rental units and found that "tenants who moved from 2021 to 2023 are more likely to be white and have higher incomes than those who remained in their homes." *Id.* The City Council, as this Report makes clear, believed the FARE Act could improve housing mobility issues in the City, even if the Act would not be a solution to the broader affordability issues in the City's housing market. The City has thus identified multiple, substantial and genuine interests in passing the regulation, one of which is improving housing mobility for renters in the City. As a result, the second prong of *Central Hudson* is satisfied.

**ii.**

29

In order "[t]o satisfy the third prong of *Central Hudson*, the City must demonstrate that (1) the harms it recites are real, and (2) that its restriction will in fact alleviate them to a material degree." *Vugo*, 931 F.3d at 52 (citation modified). The City has developed a detailed legislative record that demonstrates that the harms it identifies are real. One such harm, as discussed *supra* Part II.C.i, is that the high cost of brokers' fees prevents New York City renters from moving apartments. As part of its deliberations on the FARE Act, the City Council heard a full day's worth of testimony from interested parties and accepted hundreds of pages of written submissions from the Act's supporters and critics, including submissions from multiple tenant-advocacy organizations (Jt. App'x at 73–393; Jt. App'x at 395–665). The testimonials and data submitted to the Council clearly support the City's claim that the brokers' fees prevented mobility by increasing the upfront costs of moving, Jt. App'x 438, and as previously discussed, the survey that said "60 percent of New York City renters said broker fees prevent them from moving into a different apartment and over half of the city's renters (54 percent) would be willing to a pay a higher monthly rent if they didn't have to pay upfront broker fees." *Id.* at 673. This Court has previously allowed the City "to justify speech restrictions by reference to studies and anecdotes," such as the ones it relied

upon in enacting the FARE Act. *Vugo*, 931 F.3d at 52 (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001)).

Another harm the City raises is the existence of a mismatch between those hiring brokers and those paying their fees. In addition to relying on surveys and written submissions from individuals and advocacy organizations, the City Council's Oversight and Investigations Division (OID) conducted an investigation to determine how brokers' fees were actually being presented by brokers and paid by tenants. The results of this investigation support the City's contention that the principal-agent relationship in the City's rental market is misaligned. The OID investigation found that: (1) brokers often refused to engage in any meaningful negotiation with tenants; (2) brokers rarely required prospective tenants to sign a brokerage agreement before touring a rental property; (3) whether a broker purports to represent the landlord, the tenant, or both does not correlate meaningfully with the provision of different services by the broker; and (4) in 12% of properties toured by investigators, no broker was present at all. Jt. App'x at 674–76.

Cumulatively, the City's investigation, studies, and anecdotal information it received as part of the legislative process sufficiently support the City's claim

31

that the misalignment of the principal-agent relationship in New York City's rental market causes "real" harm because those paying brokers' fees are often not the same parties hiring the brokers. *See Vugo*, 931 F.3d at 52. As a result, tenants "are often forced to pay a broker's fee despite lacking a meaningful ability to negotiate the amount of those fees." Jt. App'x at 674. Either of the City's articulated harms (reduced renter mobility or a misalignment in the principal-agent relationship), standing alone demonstrate that the harms the City identified, and aims to remedy by passing the FARE Act, are real.

Having shown that the harms targeted by the FARE Act are genuine, to satisfy prong three of the *Central Hudson* test, the City must also demonstrate that the publication bar will alleviate those harms. *See Vugo*, 931 F.3d at 52. Again, the City has done so. The FARE Act materially advances the City's interest in improving housing mobility by lowering the costs of moving. If renters no longer have to pay a fee to brokers at the time they move into a new apartment – the cost of relocation falls, which is why 60% of New York City's renters said brokers' fees prevent them from moving and why over half of the City's renters would be willing to pay more in monthly rent if they didn't have to pay brokers' fees upfront. Jt. App'x at 673.

Plaintiffs argue that the June 12, 2024 testimony of the Deputy Commissioner of Housing Preservation and Development (HPD) demonstrates the Council had "no data" before it to support the notion that ending tenant-pays broker fees would improve housing mobility. Jt. App'x at 110. But this quote by a Councilmember was pulled out of context from the Deputy Commissioner's testimony at the June 12 Hearing regarding brokers' fees. Earlier in his testimony he had explained that HPD "[has] no broker fees," so it was not particularly surprising that he didn't bring data regarding the impacts of brokers fees on housing mobility. *Id.* at 101. The lack of data provided by a single witness also does not support the conclusion that the Council lacked any evidence before it that eliminating tenant-pays broker fees would improve housing mobility. As explained above, the City relied on substantial evidence, including surveys, supporting its claim that a majority of New York City tenants would be able to move apartments more freely if they did not have to contend with upfront broker fees. As Plaintiffs' own expert concedes, "a new tenant will face a lower total upfront cost under the FARE Act." *Id.* at 814.

Plaintiffs also assert that the FARE Act will actually *worsen* housing mobility. Appellants' Br. at 40. Specifically, they argue that the FARE Act will

decrease available housing stock in New York, make the housing market less transparent, and drive increases in rents. Even if this were true, Plaintiffs fail to convincingly argue that their parade of horribles will outweigh the benefits of ending tenant-pays broker fees. Again, even Plaintiffs' own expert concedes that the "magnitude of the fee's impact relative to housing scarcity . . . is not fully understood." Jt. App'x at 814. Further, as we will discuss in more detail in our analysis of *Central Hudson's* final prong *infra* Part II.C.iii, it is not within this Court's purview to predict second- or third-order effects of enacted legislation based on the premise that a law could have unintended consequences which could undermine its ultimate effectiveness. Instead, we "defer[] to the city's judgment about 'the appropriate means to further [its] legitimate governmental interest.'" *Vugo*, 931 F.3d at 58 (quoting *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 105 (2d Cir. 2010)).

The City Council identified multiple legitimate government interests – including reducing the high cost of moving apartments in New York City and aligning the principal-agent relationship in the City's rental market. To further these interests, the City decided to prohibit tenant-pays broker fees for open listings. This was a proper use of the City Council's authority and Plaintiffs are

34

not entitled to injunctive relief because they dislike the outcome of the legislative process.

**iii.**

At *Central Hudson's* final step, we determine "whether the speech restriction is not more extensive than necessary to serve the interests that support it." *Reilly*, 533 U.S. at 556 (citation modified). The Supreme Court has made clear that reviewing courts should not apply a "least restrictive means" test, *id.*, but instead must determine if there is "a reasonable fit between the means and ends of the regulatory scheme," *id.* at 561.

Plaintiffs argue that § 20-699.21(a)(2) is both unnecessary and overinclusive because it also regulates brokers who have no fiduciary responsibility to landlords who own the units posted online. Instead, Plaintiffs contend that the "solution is better enforcement of tenant's agents' fiduciary obligations, not forbidding speech." Appellants' Rp. Br. at 16. But it is "beside the point" if a court can identify "proposed alternative methods" for achieving a certain goal. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 67 (2006). When applying intermediate scrutiny, this Court does not question whether other policies "might be adequate, because that determination is left to City officials." *Clementine Co., LLC v. Adams*, 74 F.4th 77, 88 (2d Cir. 2023) (citation modified). Rather this Court

looks to whether the "interest would have been achieved less effectively absent [the challenged policy]." *Id.* Therefore, Plaintiffs fail to meet their burden by simply arguing better solutions exist to the harms the City has identified. The standard under *Central Hudson* and its progeny does not require that at prong four we insist "there be no conceivable alternative, but only that the regulation not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 478 (1989) (quoting *Ward*, 491 U.S. at 799). In other words, the test at this step of *Central Hudson* is whether the regulation is a *reasonable* fit, not whether it is the *best* fit.

The FARE Act does not "burden substantially more speech than is necessary," and leaves open alternative channels for communication. *Id.* Plaintiffs label § 20-699.21(a)(2) as a "publication bar," but brokers are not banned from posting open listings – they simply cannot charge tenants fees when they openly list an apartment for rent. Brokers are also not banned from collecting fees from tenants when they have an exclusive brokerage agreement with a tenant. In that arrangement, the Act allows brokers to work, and communicate, directly with tenants and still be compensated by those tenants. The FARE Act also leaves the door open for brokers to publish open listings and be compensated by landlords.

36

"[W]here the regulation leaves open alternative channels for communicating the speech, they need not be perfect substitutes for those channels denied to plaintiffs by the regulation at hand." *Clementine*, 74 F.4th at 88 (citation modified). Here, the FARE Act leaves open those alternatives as our caselaw under the First Amendment requires.

Through § 20-699.21(a)(2), the City has developed a regulation that is a "reasonable" way to address the problem it has identified. *Vugo*, 931 F.3d at 58. "[T]he City is afforded considerable leeway in determining the appropriate means to further a legitimate government interest," *Clear Channel*, 594 F.3d at 105 (citation modified), and a court should not "second-guess [the City's] judgment to that effect," *Vugo*, 931 F.3d at 58 (quoting *Fox*, 492 U.S. at 478), unless the law is unreasonable. We hold that § 20-699.21(a)(2) is not unreasonable. The City has sufficiently demonstrated that the Act addresses "real-world concerns" and "functional realities," that it is empowered to regulate. Appellees' Br. at 50. Accordingly, the fourth and final prong of the *Central Hudson* test is satisfied. We therefore conclude that Plaintiffs have failed to state a plausible First Amendment commercial speech claim and affirm the district court's dismissal of this claim.

### III. The Contracts Clause Challenge

Before the district court, the City moved to dismiss Plaintiffs' Contracts Clause claim and Plaintiffs moved for a preliminary injunction – seeking to enjoin the FARE Act from being enforced during the pendency of this litigation. The district court denied the motion to dismiss, finding under this Court's decision in *Melendez*, 16 F.4th 992, that Plaintiffs' Contracts Clause claim raised factual issues that "preclud[e] dismissal of [the] Contracts Clause claim as a matter of law." *Real Est. Bd.*, 786 F. Supp. 3d at 815 (quoting *Melendez*, 16 F.4th at 1040). The district court also denied Plaintiffs' motion for a preliminary injunction, finding that Plaintiffs "failed to establish that they are likely to prove that the FARE Act's impairment of existing tenant-pays exclusive listing agreements is not a reasonable and appropriate means of improving housing mobility." *Real Est. Bd.*, 786 F. Supp. 3d at 818.

The Contracts Clause restricts the power of the States to disrupt contractual arrangements and forbids the passage of "any . . . Law impairing the Obligation of Contracts." U.S. Const., art. I, § 10, cl. 1. In interpreting the Contracts Clause, the Supreme Court has limited its scope and allowed laws that impair private contracts, so long as those restrictions are in furtherance of "the inherent police

38

power of the State 'to safeguard the vital interests of its people.'" *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)).

Plaintiffs argue that the City exceeded its authority under the Contracts Clause by passing the FARE Act because it substantially impaired Plaintiffs' tenant-pays exclusive-listing agreements by prohibiting landlords' agents from collecting fees for those listings from tenants.

The exclusive listing agreements at issue share three characteristics: (1) a broker works to secure tenants for a vacant apartment, (2) the broker seeks payment for their services from a tenant, not a landlord, and (3) a landlord promises to refer all inquiries about an apartment to the same broker. Plaintiffs assert that because the FARE Act prohibits the second and third elements, the Act upends both contractual parties' (landlords and brokers) reasonable expectations about how brokers will be paid and thus unconstitutionally impairs the parties' private contractual arrangements.

On appeal, Plaintiffs contend the district court erred in denying their motion for a preliminary injunction, because they are likely to succeed in demonstrating that the FARE Act violates the Contracts Clause. The City, on the other hand,

argues that the district court correctly held that Plaintiffs are not entitled to a preliminary injunction, and in any event, the request for a preliminary injunction is moot as of October 31, 2025.

**A.**

We must first turn to mootness. The City argues that Plaintiffs' motion for a preliminary injunction is now moot because nearly all of the contracts produced by Plaintiffs post-date the law's enactment, and the only contract entitled to a preliminary injunction during the pendency of this appeal was due to expire on October 31, 2025. We are not persuaded that this issue is moot.

At this stage of litigation, Plaintiffs' Contracts Clause claim must plausibly allege that the City impaired "*existing* contracts," at the time the challenged law went into effect. *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 124 (2d Cir. 2004). Accordingly, Plaintiffs' claim is limited to tenant-pays exclusive listing agreements executed before December 13, 2024, which is when the FARE Act became law, and that remained executory beyond June 11, 2025, which is when the law took effect. Further, Plaintiffs' request for injunctive relief is limited only to agreements that are still valid during the pendency of this appeal.

40

At the preliminary injunction stage, to show that their Contracts Clause claim is justiciable, Plaintiffs "must set forth by affidavit[s] or other evidence specific facts," beyond "mere [factual] allegations," *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025) (quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)), but are "not required to prove [their] case in full at a preliminary-injunction hearing," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Here, Plaintiffs have met their burden.

The strongest proof for the proposition that Plaintiffs' Contracts Clause claim remains "live" comes from the declaration of Thijs Menger, a managing member of two companies (Milan Associates, L.P. and Franpearl LLC) that own buildings in New York City. Jt. App'x at 937-38. According to Menger, the FARE Act impaired existing contracts when it went into effect. In his uncontested declaration, Menger explained that "Milan Associates and Franpearl have longstanding exclusive listing agreements with BOND New York Real Estate Corp. ('BOND') giving BOND the exclusive right to advertise apartments in the Buildings and to collect its broker fee from the tenant when an apartment is rented." *Id.* at 938. Menger further submits that the "Building Owners and BOND entered into these exclusive listing agreements in 2017 and the agreements

41

continue to this day." *Id.* BOND, for its part, separately alleges that it had many tenant-pay exclusive listing agreements. *See e.g.*, *id.* at 778 ("70 percent of BOND's listings are open listings, and 30 percent are exclusive."); *id.* at 776 ("[T]he FARE Act will invalidate many long-term exclusive listing agreements that BOND executed with landlords across the City.").

Plaintiffs provided additional support for the proposition that the Act impaired existing contracts when it went into full effect. Plaintiffs highlighted examples of the contractual terms of tenant-pay exclusive listing agreements impaired by the FARE Act, from BOND's "Exclusive Right to Rent" agreement. *Id.* at 49–50. Furthermore, several affidavits attested to the fact that these agreements "last for a year, or even longer." *Id.* at 780, 800. At oral argument, Plaintiffs' counsel represented that they would be able to produce a contract executed before December 13, 2024 that remains executory beyond the pendency of this appeal.

The City failed to challenge these claims or the affidavits that supported them below and declined an evidentiary hearing on Plaintiffs' preliminary injunction motion. *Id.* at 9. "A party against whom an injunction is sought will be found to have waived its right to a hearing only where that party was

42

demonstrably 'content to rest' on affidavits submitted to the court." *Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745, 748 (2d Cir. 1987). Thus, the City was "content to rest" on the affidavits submitted to the district court. *See id.*

Based on their submissions to the district court, Plaintiffs have sufficiently demonstrated the existence of tenant-pays exclusive listing contracts that were executed before December 13, 2024, and remain executory beyond the pendency of this appeal. Accordingly, Plaintiffs' motion for preliminary injunction as to their Contracts Clause claim is not moot and we proceed to evaluate it on the merits.

**B.**

A party "seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that the plaintiff is likely to suffer irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of the injunction." *Res. Grp. Int'l Ltd v. Chishti*, 91 F.4th 107, 114 (2d Cir. 2024) (citation modified). Typically, district courts in this Circuit may also grant a preliminary injunction if the plaintiff fails to demonstrate a likelihood of success on the merits but can demonstrate that the case presents "sufficiently serious questions going to

the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor." *Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019), *vacated and remanded on other grounds sub nom., Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020). But, "[w]hen, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (citation modified). Accordingly, our analysis ends if we agree with the district court's conclusion that Plaintiffs failed to show a likelihood of success on the merits of their claim.

To determine whether Plaintiffs are likely to succeed on the merits of their Contracts Clause claim, this Court asks: "(1) whether the contractual impairment is substantial and, if so, (2) whether the law serves a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) whether the means chosen to accomplish that purpose are reasonable and necessary." *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 64 (2d Cir. 2020) (citation modified).

**i.**

To determine under step one whether the FARE Act substantially impairs the contractual rights of brokers and landlords who have entered into tenant-pays exclusive listing contracts, we consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Melendez*, 16 F.4th at 1033 (quoting *Sveen v. Melin*, 584 U.S. 811, 819 (2018)).

In applying these factors, we conclude that the FARE Act substantially impairs tenant-pay exclusive listings contracts. The three essential elements of an exclusive-listing tenant-pays contract are: (1) a broker working to identify tenants, (2) a tenant paying the broker for their services, and (3) the landlord only referring inquires to a single broker. In these types of agreements, brokers are effectively agreeing to forgo their right to seek payment from a landlord in exchange for exclusive rights to a listing from a landlord. By effectively prohibiting the second two elements of these types of contracts, the FARE Act straightforwardly "undermines the contractual bargain" between the parties. *Sveen*, 584 U.S. at 819. And while the City deferred implementation of the law for 180 days after its passage, after the FARE Act went into effect it "worked a severe, permanent, and

immediate" change rather than a "temporary alteration" of the parties' contractual relationships. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978).

The parties, in entering into these contracts, reasonably expected their bargains would not be upended by the City not withstanding "the fact that New York has sometimes, and to varying degrees, regulated its . . . real estate market." *Melendez*, 16 F.4th at 1034. The fact that real estate is heavily regulated in New York does not shield any regulation of that market from scrutiny under the Contracts Clause. The Act was also not foreseeable simply because Plaintiffs knew the City may have, at some point in the future, implemented a law like this one, that effectively nullified tenant-pays exclusive listings. By removing brokers' ability to seek compensation from tenants directly, a broker's contractual commitment to forgo seeking payment from the landlord is "'converted into a mere promise' to provide [their] services free of charge, 'thereby impairing the contract's obligatory force,'" as brokers cannot be expected to work for free of charge. *Real Est. Bd.*, 786 F. Supp. 3d at 813 (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992)) (citation modified).

The City, on the other hand, offers no rebuttal other than to suggest that Plaintiffs were only able to identify one active contract impaired by the Act.

46

However, we have already considered, and rejected, the City's mootness argument. Because we find Plaintiffs "have plausibly alleged a significant impairment of contract," we proceed to the second step of our Contracts Clause analysis. *Melendez*, 16 F.4th at 1035.

**ii.**

To serve a legitimate public interest, the challenged law or regulation must be "aimed at remedying an important general social or economic problem." *Conn. State Police Union v. Rovella*, 36 F.4th 54, 63 (2d Cir. 2022) (citation omitted). The record demonstrates that the FARE Act was directly aimed at addressing the City's housing crisis. Indeed, Plaintiffs themselves admit that "City officials have acknowledged the current situation as a 'housing emergency'." Jt. App'x at 20. As we previously discussed, one of the City's core objectives in passing the Act was to "reduc[e] the upfront cost of moving, thereby improving housing mobility amongst renters." *Real Est. Bd.*, 786 F. Supp. 3d at 814. The district court correctly found this purpose to be "legitimate under the Contracts Clause," *id.*, and found that the Act was intended to remedy multiple "general social or economic problem[s]," *Rovella*, 36 F.4th at 63 – including the high cost of moving in New York City.

47

In response to the district court's conclusion, Plaintiffs recycle their argument that housing mobility was a *post hoc* rationalization and assert that "[t]he Council expressly disclaimed an interest in improving housing mobility." Appellants' Br. at 48. But to support this claim, Plaintiffs rely in large part on their *own statements* submitted during the legislative process. *Id.* As previously discussed, the record below is clear that the Council was concerned about the high cost of moving within New York City, and the impact this so-called market failure has on housing and economic mobility in the City. *See, e.g.,* Jt. App'x at 673.

Plaintiffs also, once again, contend that "ending tenant-pay[s] fees will make moving harder, not easier," and thus does not further a legitimate purpose. Appellants' Br. at 49. This conclusory argument fails for the same reason it failed in the First Amendment context: Appellants offer no evidence to support their claim and their expert only argued that the "FARE Act is unlikely to *significantly increase* tenant mobility." Jt. App'x at 825 (emphasis added). Indeed, he admitted that "[w]hile the upfront cost of the broker fee is a transaction cost that contributes to lower mobility for renters, the magnitude of the fee's impact relative to housing scarcity . . . is not fully understood." *Id.* This concession offers no real support for Plaintiffs' claim that the FARE Act will make moving within New York City

harder, as opposed to easier. Putting aside the veracity of Plaintiffs' claims, our Contracts Clause precedent also does not permit us to second-guess the City's actions based on potential second-order effects. *See Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998) ("[I]t is not the province of this Court to substitute its judgement [sic] for that of . . . a legislative body . . . .").

Plaintiffs also argue that demonstrated hostility from the Council toward landlords and brokers, and a desire to benefit a "favored group" (tenants) at the expense of a "disfavored group" (landlords) undermines the Council's argument that the FARE Act was enacted to protect a basic social interest. Appellants' Br. at 49. However, this argument is foreclosed by our opinion in *Melendez*. There, we evaluated a law enacted by the New York City Council that made personal lability guaranties on certain commercial leases unenforceable for any rent obligations that arose during a specific period of the COVID-19 pandemic. *Melendez*, 16 F.4th at 1004-08. Corporate landlords challenged the "Guaranty Law" under the Contracts Clause, and in part argued that in passing the law, the City Council was not aiming to "protect a basic societal interest" but instead intended to benefit "a favored group," who were often small business owners that personally guaranteed to pay rent in the event their businesses defaulted on rental

49

obligations. *Id.* at 1037. We rejected that argument. We concluded that the law was not passed to further the interest of a subset of individuals but rather represented an effort by the City to advance "society's larger interest in maintaining the small businesses necessary for functioning neighborhoods." *Id.*

The same is true here. Both improving housing mobility and realigning the principal-agent relationship in the real estate market are valid societal interests. As to the alleged hostility demonstrated by the Council, in "divin[ing] the true purpose of [a] measure," this Court will not view "the motivations of individual legislators . . . [as] dispositive." *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 283 n.13 (2d Cir. 1997). For those reasons, we conclude that the legislative record on this issue is clear: the FARE Act was enacted to further a legitimate public purpose. Accordingly, we proceed to the third step of our analysis to determine if the legislation reasonably advances the City's proffered interests.

### iii.

Because the regulation both substantially impairs contractual obligations and was enacted in furtherance of a legitimate public purpose, we must now, under step three, determine whether Plaintiffs have plausibly alleged that the FARE Act is not "drawn in an 'appropriate' and 'reasonable' way to advance" the

50

Act's purpose. *Sveen*, 584 U.S. at 819 (quoting *Energy Rsrvs. Grp.*, 459 U.S. at 411–12). In *Melendez*, we identified at least five factors relevant in this analysis: (1) whether the law impairs contractual rights on a temporary or limited basis, or whether it permanently and entirely extinguishes them; (2) whether there is some record basis to link the legislature's purpose and its chosen means; (3) whether, if the burden of contractual impairment comes at the expense of a discrete group of private persons, it is tailored to the party causing the public harm that the state sought to mitigate; (4) whether the relief provided by the law is conditioned on need and, if not, whether the legislature adequately considered the extent to which the party burdened by the contractual impairment is better positioned financially than the relieved party to bear that burden; and finally, (5) whether the law provides compensation for damages or losses sustained as a result of the impairment.[7]  16 F.4th at 1038–46.  No single factor controls.  Instead, it is the

---

[7] The list of *Melendez* factors used to determine whether a regulation is drawn in an appropriate and reasonable way to advance its purpose is not exhaustive.  *See* 16 F.4th at 1046 ("[T]he parties may . . . identify still other circumstances relevant to determining whether the [law] is a reasonable and appropriate means to serve the City's professed public purpose.").  Since the parties have not addressed additional circumstances, we proceed to analyze the FARE Act under those factors identified in *Melendez*.

"totality" of the factors that determines the strength of a plaintiff's claim and thus likelihood of success on the merits. *Id.* at 1038.

The City concedes that Plaintiffs' contractual rights are impaired on a permanent basis and that the law provides no compensation to offset the resulting losses. As a result, both parties agree that prongs one and five weigh against the reasonableness of the regulation. However, the parties dispute which way prongs two, three, and four cut. And so we analyze each in turn.

**a.**

The second *Melendez* factor asks whether there is a "record basis" that links the legislature's stated purpose for a piece of legislation with the means chosen to achieve the goal. We agree with the district court that the required record basis has been demonstrated by the City.

Plaintiffs dispute this contention, arguing that the law could have exempted existing contracts, which would have been an equally effective method of achieving their stated goals, but the Council considered this option and rejected it. We are convinced that had the City included carveouts for various pre-existing contracts in the final version of the Act, it would have likely decreased the law's efficacy and enforceability. This change would have created the risk of a dual-tier housing market, in which some units would have been subjected to the old tenant-

52

pays model of brokers' fees and some units would have been regulated under the new regime. Such a system would likely cause significant confusion among renters who would often not have visibility into the origin of the agreements governing the relationships between brokers and landlords.

The current regulatory regime, as put in place by the City under the enacted version of the FARE Act, is far more straightforward – these types of arrangements are prohibited – full stop. Renters in New York City can be reliably informed by their government officials that they will not have to pay brokers' fees when they do not retain a broker. Creating exceptions would have made it considerably more difficult for renters to report FARE Act violations, undercutting the City's ability to enforce the law. In any event, it is not for this Court to "second-guess the wisdom of picking [the FARE Act] over other policy alternatives" when determining whether the legislative enactment is reasonable and necessary. *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 372 (2d Cir. 2006). Accordingly, we conclude that there is a record basis to link the legislature's purpose to its chosen means of achieving that purpose. The City had no obligation to structure the law to exempt contracts entered into before the date of the bill's introduction or to

otherwise circumscribe the law along the lines that Appellants would have preferred. Accordingly, factor two weighs in favor of finding reasonableness.

**b.**

The third and fourth factors focus on which party bears the burden of the contractual impairment. The third prong asks us to consider whether the burden of contractual impairment comes "at the expense of a discrete group of private persons," and if so, whether the targeted group is "causing the public harm that the [City] sought to mitigate." *Melendez*, 16 F.4th at 1042. Plaintiffs and the City both agree that the contractual impairment imposed by the FARE Act comes at the expense of landlords and benefits tenants, but they disagree as to the fairness of that distribution of burdens.

Under the previous "tenant-pays system," landlords that listed units with fees chose to impose the cost of brokers' services on tenants rather than bear it themselves. This approach, however, significantly increased the upfront costs of relocation in the City. *See* Jt. App'x at 673. Therefore, it is reasonable to conclude that landlords are the "persons . . . responsible for the circumstances warranting relief," even if landlords do not bear all the responsibility for the affordability crisis in New York's housing market. *Melendez*, 16 F.4th at 1042.

54

At the fourth prong, we ask the related question of whether the legislature adequately considered the extent to which the party burdened by the contractual impairment is "better positioned financially" than the relieved party to bear that burden. *Id.* at 1044. Ultimately, the cost of brokers' services must be borne by a party. The City Council chose to allocate that burden, in the form of fees, to landlords in part because they can withstand (or re-allocate) the burden. *See e.g.*, Jt. App'x 673–76. While landlords can negotiate with brokers in an effort to obtain the best deal on their fees, potential tenants were stuck with the brokers advertising their chosen apartment – and the fees those brokers charged. Significantly, the City's investigation found fee negotiations between brokers and renters almost never happened. *See* Jt. App'x at 674. Instead, under the old tenant-pays system, renters were confronted with "take-it-or-leave-it" offers and could either pay the fee required by a broker for a given apartment, or they could walk away and look elsewhere. *Id.*

Landlords, in contrast, likely have more bargaining power than tenants, or as Plaintiffs concede, have more flexibility in allocating fees. For example, Plaintiffs argue that ending the tenant-pays model will cause rents to rise because landlords will choose to pass that cost along to tenants in the form of higher rents.

55

Inherent in this argument is the reality that landlords can reallocate the fees – they may pass on the entire brokers' fee to the tenant in terms of rent, they may pass on half, or they may pass on none. The amount they increase rent, however, will at least partially dictate how attractive the pricing of their unit is to prospective renters as the higher they price a unit, all else being equal, the lower demand will be for that unit. The point remains that even if landlords price the entire brokers' fee into a years' worth of rent, this will amortize what was previously a one-time, upfront cost across a yearlong period.

In the vision of the housing market advanced by Plaintiffs, both landlords and tenants are on equal footing. But the reality is that landlords often choose their role in the housing market and tenants typically do not. While there may be some exceptions, few landlords are "forced" to hold property in New York City. On the other hand, the majority of those who choose to live in New York have no choice but to navigate the City's complicated and difficult rental market. Given these realities, the City Council's decision to reallocate the economic burden of brokers' fees to landlords is not unreasonable. Appellants' reliance on *Melendez* is misplaced here. In *Melendez*, commercial landlords were stripped of their ability to seek unpaid rental arrears from guarantors during the COVID-19 pandemic and

had no way of reallocating that burden.  16 F.4th at 1004-08.  Here, as Plaintiffs themselves argue, landlords can do so in the form of higher rents.  The weight of the burdens is thus not the same and can more easily be reallocated.  *Id.* at 1042.  Accordingly, for these reasons, we conclude that factors three and four cut in favor of the City and consequently, we conclude that Plaintiffs have failed to demonstrate that they are likely to establish that the FARE Act violates the Contracts Clause.

Because Plaintiffs "seek[] a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party can establish a clear or substantial likelihood of success on the merits."  *Frey v. City of New York*, 157 F.4th 118, 127 (2d Cir. 2025) (citation modified).  Plaintiffs have failed to establish a substantial likelihood of success on the merits.  Consequently, we are not called on to determine whether other factors, such as public interest and a balancing of the equities, favor injunctive relief.  Accordingly, we conclude that the district court did not abuse its discretion when it denied Plaintiffs' motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgement of the district court.